UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **RONNIE L. MORGAN, JR.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 06-5700** |
| **MARLIN GUSMAN, CRIMINAL SHERIFF ORLEANS PARISH, CORNEL HUBERT, WARDEN, ELAYN HUNT CORRECTIONAL CENTER; JOHN DOE, ELAYN HUNT CORRECTIONAL CENTER** | **SECTION "B"(4)** |

## AMENDED ORDER AND REASONS

The defendant Warden Cornel Hubert's **Motion for a Protective Order (Rec. Doc. No. 82)** came before the Court for oral argument. The defendant seeks a protective order to prevent the depositions of two non-parties, former DOC Secretary Richard Stalder and Angela Whitaker, on the basis that the depositions are outside of the scope of the limited discovery ordered by the United States Fifth Circuit Court of Appeals on Hubert's qualified immunity defense. The plaintiff opposed the motion on the basis that the depositions are relevant to the testimony received from Warden Hubert on the qualified immunity issue.[1] After considering the motion, the opposition, and the argument of counsel, the motion will be granted in part and denied in part for the following reasons.

---

[1] Rec. Doc. No. 83.

I.   **Factual Allegations Relevant to Warden Hubert**

The plaintiff, Ronnie L. Morgan, Jr. is a federal inmate who was housed in protective custody in the House of Detention ("HOD") within the Orleans Parish Prison system ("OPP") at the time of Hurricane Katrina. This suit was filed pursuant to 42 U.S.C. § 1983 by retained counsel and the filing fee was paid. Named as defendants are Cornel Hubert, Warden of Elayn Hunt Correctional Center ("Hunt") and Sheriff Marlin Gusman.

In the complaint, Morgan alleges that he did not have food, water, and medical care at OPP after the electricity failed on August 29, 2005, in connection with Hurricane Katrina. He alleges that the toilets backed up with human waste. He claims that he was not evacuated from the jail until September 1, 2005, when he was moved to I-10 and later transported by bus to Hunt.

At Hunt, he claims that he was placed with thousands of inmates in an open field which was surrounded by guards. Morgan further alleges that he told an unidentified prison guard that he was in protective custody and needed to be moved. Another inmate, not the plaintiff, explained to the guard that he saw his enemies in the field and feared that he too would be attacked. The unidentified guard advised the plaintiff and other alleged protective custody inmates not to disclose their identities to other inmates.

One protective custody inmate, not the plaintiff, was later attacked. When he tried to get to the guards, shots were fired. Approximately 30 minutes later, the plaintiff was attacked and stabbed in the head and neck. When he approached the guards at the gate, they laughed at him and offered no help.

The plaintiff alleges that he remained in blood-soaked clothes wandering the field, afraid to sleep. He was eventually transferred out of Hunt on September 2, 2005, having never received

2

medical attention for his wounds. As a result of the defendants actions or inactions, plaintiff alleges that he sustained serious bodily injury which resulted in scarring. He also continues to suffer from headaches, sleeplessness and emotional damage stemming from the horrors to which he was subjected. He seeks monetary damages, costs, and attorneys' fees.

## II.     Procedural Background

On July 23, 2009, the United States Fifth Circuit Court of Appeal reversed the District Judge's order denying Warden Hubert's Motion to Dismiss based on a qualified immunity defense.[2] *Morgan v. Hubert*, 335 Fed. Appx. 466 (5th Cir. 2009). The Court specifically state that "[w]e are of the opinion that placing Morgan, a prisoner in protective custody at the time, on the field with the general prison population created an objective and substantial risk to his safety," which was sufficient to state a claim under the objective prong of the Eighth Amendment failure to protect claim. *Id.*, at p. 471.

On the subjective prong, the Fifth Circuit focused on the qualified immunity defense. The Court stated:

> In his amended complaint and reply, Morgan alleges the following facts regarding Hubert's personal actions: (1) that Hubert created policies that placed Morgan in substantial risk of harm; (2) that he failed adequately to house, feed, and provide medical care for inmates evacuated from OPP, and particularly failed to provide protection to inmates in protective custody and to provide medical care to those assaulted; (3) that Hubert knew or should have known that transfers from OPP would include prisoners in protective custody; (4) that Hubert knew or should have known of the need to segregate these prisoners; (5) that Hubert failed to follow the policies he had in place for the segregation and protection of prisoners, and that he failed to ensure that his staff followed the policies; (6) in the alternative that Hubert failed to enact any policies and was thus deliberately indifferent to Morgan's rights; and (7) that Hubert had a personal duty to create and implement these policies or to oversee those who created and implemented the policies.

---

[2]Rec. Doc. Nos. 48 (Fifth Circuit's Order), 29 (Order and Reasons denying Motion to Dismiss, Rec. Doc. No. 9).

3

> The difficulty with these allegations is that they fail to state specifically such important facts as when Hubert knew of the transfers and what his policies were regarding them, including the handling of prisoners in protective custody. *See Schultea* [*v. Wood*], 47 F.3d [1427,] 1434 [(5th Cir. 1995)] (requiring the plaintiff to support a "claim with *sufficient precision* and *factual specificity* to raise a genuine issue as to the illegality of defendant's conduct at the time of the alleged acts" (emphasis added)). The time line from Hubert's planning for the hurricane to Morgan's arrival at EHCC is crucial to the deliberate indifference analysis, directly bearing on Hubert's knowledge of the events.

*Morgan*, 335 Fed. Appx. at 472.

Thus, having resolved that Morgan sufficiently stated an Eighth Amendment violation, one clearly established in the law, the Court remanded the matter back to the District Court to allow for discovery limited to the qualified immunity issue, more specifically the reasonableness prong of the qualified immunity analysis. The Court held as follows:

> We are mindful that the protection afforded by qualified immunity applies to the lawsuit itself, and not merely to liability, and thus the issue should be resolved as early as possible. *See Babb v. Dorman*, 33 F.3d 472, 477 (5th Cir. 1994). Thus, we are reluctant to allow the case to proceed to full discovery with important questions regarding qualified immunity left unanswered. *Schultea* points the way forward. We noted there the district court's ability to tailor discovery to the defense of qualified immunity: "The district court may ... limit any necessary discovery to the defense of qualified immunity." 47 F.3d at 1434. Such a course is called for here. Because key facts are unknown, and because these facts are solely within Hubert's possession, we do not consider the parties' remaining arguments regarding deliberate indifference. Instead, we vacate the district court's denial of qualified immunity and remand for discovery limited to that issue. We instruct the district court to carry the issue of qualified immunity and decide it anew once that discovery is complete.
> Additional facts establishing the time line are particularly important when evaluating the second prong of the qualified immunity test-the reasonableness of Hubert's actions in light of the clearly established constitutional right. While the fact of Hurricane Katrina is unquestionably relevant to this inquiry, so too are the facts noting when Hubert learned of impending transfers and what steps he took to prepare for them. Several days of notice versus hours or even minutes of notice greatly changes the reasonableness calculus. Under such circumstances, remand for limited discovery is appropriate.

*Morgan*, 335 Fed. Appx. at 472-73.

The District Judge issued a scheduling order on January 11, 2010, which set a non-jury trial for October 18, 2010.[3] In connection therewith, a discovery deadline was set for August 30, 2010.

On Hubert's motion, the District Judge also reset Hubert's Motion to Dismiss (Rec. Doc. No. 9) for hearing on April 28, 2010 without oral argument.[4] Morgan has been ordered to submit his responsive pleading to the motion by August 10, 2010.[5] The Motion remains pending before the District Judge.

### III. <u>Standard of Review</u>

The decision to enter a protective order is within the Court's discretion. *Thomas v. Int'l Bus. Mach.*, 48 F.3d 478, 482 (10th Cir. 1995). Rule 26(c) governs the issuance of protective orders. It provides in pertinent part:

> A party or any person from whom discovery is sought may move for a protective order in the court where the action is pending--or as an alternative on matters relating to a deposition, in the court for the district where the deposition will be taken. The motion must include a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action. The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . .

Fed. R. Civ. P. 26(c).

Rule 26(c), however, contains a requirement that good cause be shown to support the issuance of a protective order, providing that "the burden is upon the movant to show the necessity of its issuance, which contemplates a particular and specific demonstration of fact as distinguished

---

[3] Rec. Doc. No. 54.

[4] Rec. Doc. No. 58.

[5] Rec. Doc. No. 81.

from stereotyped and conclusory statements." *In re Terra Int'l, Inc.*, 134 F.3d 302, 306 (5th Cir. 1998).

**IV.    Analysis**

As background, the United States Fifth Circuit specifically remanded this matter back to the District Court for discovery on the limited issue of Warden Hubert's qualified immunity. In addressing the relevancy of these depositions, the Court must consider the burden of proof necessary to establish, and oppose, a qualified immunity defense.

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Although qualified immunity is an affirmative defense, "the plaintiff has the burden to negate the assertion of qualified immunity once properly raised." *Collier v. Montgomery*, 569 F.3d 214, 217 (5th Cir. 2009).

The federal courts utilize a two-step analysis to determine whether officials are entitled to qualified immunity for a constitutional violation. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part by Pearson v. Callahan*, __ U.S. __, 129 S.Ct. 808, 813 (2009); *see also Collier*, 569 F.3d at 217. The United States Supreme Court has recognized that the lower courts have the discretion to decide which prong to address first, "in light of the circumstances of the particular case at hand." *Pearson*, 129 S. Ct. at 818; *Collier*, 569 F.3d at 217.

In one step, the courts will determine whether the plaintiff has alleged a violation of a constitutional right and, in the other step, whether the officers' conduct was objectively reasonable in light of clearly established law at the time the challenged conduct occurred. *Tarver v. City of*

*Edna*, 410 F.3d 745, 750 (5th Cir. 2005) (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). In determining the reasonableness, the courts will apply an objective standard, "based on the viewpoint of a reasonable official in light of the information then available to the defendant and the law that was clearly established at the time of the defendant's actions." *Freeman v. Gore*, 483 F.3d 404, 411 (5th Cir. 2007).

At this juncture, the Fifth Circuit has already resolved, without comment on the ultimate success of the merits, that Morgan has at least stated a violation of the Eighth Amendment. The District Court is left to resolve the remaining step, whether Hubert's conduct was objectively reasonable. This should be the focus of the plaintiff's limited discovery.

From Warden Hubert's deposition arose the plaintiff's decision to notice the depositions of Stalder and Whitaker. In the motion and oral argument, the defendant seeks protection from these depositions on three grounds: (1) the District Judge's order implies that the "recent" discovery is complete in light of the setting a deadline for plaintiff's response to the pending motion to dismiss; (2) even if discovery is not presumed to be complete, the Fifth Circuit's opinion limited discovery solely to those matters within Warden Hubert's knowledge and his deposition has been taken; and (3) the plaintiff has not demonstrated that the testimony of Stalder and Whitaker is not relevant to the qualified immunity issue.

The Court does not find any support for the movant's first contention. This is defense counsel's second attempt to arbitrarily set a cut-off for the plaintiff's limited discovery. As noted previously, the District Court's overall discovery deadline is set for August 30, 2010. As conceded by counsel, this is directed at discovery related to substantive matters, under the assumption that qualified immunity will be resolved before that time. Related thereto, on the defendant's motion,

on April 9, 2010, the District Court reset the hearing on Hubert's motion to dismiss for August 28, 2010. It was not until over two months later, on July 1, 2010, that the Court set the deadline for the plaintiff to file his response on July 10, 2010, in light of the qualified immunity discovery. The deadline appears to have been set to coincide with the scheduled motion hearing and not because the limited discovery was necessarily over. The District Court has not issued any order which would declare discovery to be over or identify a date on which it is to be complete. There is no reason to award a protective order on this basis.

Next, the defendant suggests that the Fifth Circuit's remand opinion limited discovery to Warden Hubert, and does not anticipate discovery from other persons. The plaintiff disagrees with this narrow reading of the Fifth Circuit's order. Contrary to the defendant's suggestion, the Fifth Circuit did not actually limit discovery only to the deposition of Warden Hubert.

This brings the Court to the defendants third, and most compelling argument. If the depositions of Stalder and Whitaker are not relevant to the District Court's resolution of the reasonableness prong of the qualified immunity analysis, then the protective order should be granted to prevent an undue burden or expense.

This determination requires the Court to consider the relevant information already before the court, including the exhibits submitted *in camera* by the plaintiff at oral argument.[6] These exhibits are parts of Warden Hubert's deposition, an e-mail from defense counsel to plaintiff's counsel, and the After Action Summary. For purposes of this motion, the plaintiff argues that Angela Whitaker's testimony is important because she prepared the After Action Summary on which the defense

---

[6]*See* Rec. Doc. No. 88.

initially relied upon to establish the Warden's "time line" of knowledge, an issue directly addressed by the Fifth Circuit.

Warden Hubert testified at the deposition that, right after Hurricane Katrina,[7] he directed Angela Whitaker to prepare the After Action Summary. He also stated that it was not prepared for purposes of this litigation.[8] Ms. Whitaker was a "correction executive officer" whom he assigned to gather information from the notes of the senior staff, including himself, and put the report together.[9] While the report was not circulated, it was prepared based on information received from various personnel at the prison.[10]

He recognized, relying in part on the After Action Summary, that the senior staff at Elayn Hunt Correctional Center ("Hunt") met at 2:00 a.m. on Tuesday, August 30, 2005, "to begin implementation of a plan to evacuate inmates from Jefferson and Orleans parishes."[11] These nine or more assistant wardens and deputy wardens under Warden Hubert's supervision.[12] The Warden testified that first it was Jefferson Parish and then Orleans Parish. In other words, he testified, contrary to the summary, that after he began receiving inmates from Jefferson Parish he received instructions that he would get inmates from Orleans Parish.[13] He also retracted his earlier statement

---

[7] Morgan Exh. 1, Deposition pp. 71, 73.

[8] *Id*. The Court recognizes that plaintiff's counsel is concerned with the preparation date of this document in light of his understanding that defense counsel was preparing the document in or after September, 2009, in connection with this litigation. A determination of the legitimacy and/or admissibility of the After Action Report is not properly before this Court at this time and is not necessary to resolve the instant motion.

[9] Morgan Exh. 1, Deposition pp. 71, 73, 77.

[10] *Id*., pp. 71, 73.

[11] *Id*., pp. 74, 75; Morgan Exh. 3, After Action Summary, p.1.

[12] *Id*., pp. 74-75.

[13] *Id*., pp. 76, 77.

9

to say that it really was not the whole senior staff that met at 2:00 a.m. on Tuesday morning; instead, it was just he and an the deputy warden of operations.

The Warden also testified that, per the summary, on Tuesday, August 30, 2005, they conducted a brief assessment of the Orleans Parish inmates and attempted to identify them as they arrived.[14] He stated that this was "when they said we were taking too long to get the buses back."[15] When asked why he did not get the inmates off the bus and then classify them from a holding area, the Warden testified that the Orleans Parish inmates arrived so fast and without paper work, so "there was no classification to be done," although earlier they had been doing screening to see if any inmates had special needs and special medical needs. He recalled that they did classify the Jefferson Parish inmates because they arrived with records.

Although other portions of the deposition were not submitted at the hearing, portions do appear in the plaintiff's opposition memorandum. These portions indicate that at some point, the Warden testified that "Secretary Stalder called, and he said we were taking too much time getting the offenders off the bus, just get them off the bus and just send the buses back, because there were a thousand of inmates on the bridge needing to be evacuated out of New Orleans."[16] The Warden conceded that Stalder did not tell him this personally. Instead, Stalder allegedly told a staff person to tell him to send the buses back and get the inmates off and get the buses back. He later indicated that central command told his staff member to tell him that he was to "stop classifying those inmates, we need the buses back. Get them off of the buses."[17]

---

[14]*Id.*, p. 78

[15]*Id.*, p. 78.

[16]Rec. Doc. No. 83, p. 3 (quoting page 50 of the Deposition).

[17]*Id.*, p. 3 (quoting page 127 of the Deposition).

Looking at the deposition already taken and After Action Summary, there is ample information before the Court to establish that Warden Hubert and his staff began preparing for the arrival of Jefferson Parish and Orleans Parish inmates in the early morning hours of Tuesday, August 30, 2005. During the morning of August 30, 2005, Hunt began receiving Jefferson Parish inmates and knew that Orleans Parish inmates would be arriving. The Hunt staff was able to receive and classify Jefferson Parish inmates based on records received. After receiving and "screening" Orleans Parish inmates to determine those with "special needs and special medical needs," Hunt eventually stopped the screening process so that the buses could move faster. Warden Hubert believed he was following an instruction/request/suggestion to stop classifying inmates so that the buses could be turned-around faster, he knew he was receiving inmates who potentially had "special needs and special medical needs," and he had his staff stop screening Orleans Parish inmates upon receiving third-hand a directive from Stalder through command central to an unidentified Hunt staff member that the Warden either get the inmates off the buses so he could send the buses back faster or stop classifying inmates so he could send the buses back faster.

The Court is not convinced that taking the deposition of Angela Whitaker would change any of these facts for purposes of reviewing the reasonableness prong of the qualified immunity analysis. The dates on the summary are what they are, and Warden Hubert's recollection is in part in conflict with the facts set forth therein. This factual issue will be for the District Court to resolve in connection with the pending motion. Either way, under whatever the time-line actually was, Warden Hubert testified that Hunt was able to temporarily screen inmates and then they stopped to get the buses moving faster.

As for the deposition Stalder, the Court finds that the issue of whether he gave a directive to stop classifying inmates may be relevant to the District Court's determination. The test for the District Court will have to address on the reasonableness issue is not one of intentional indifference, but rather is whether a reasonable person in Warden Hubert's position and with his knowledge would have acted in the same way in light of the well-established obligation to provide protection to inmates incarcerated at Hunt.

In this circumstance, the District Court will have to consider, and the Warden will have to establish, whether he conducted himself in an objectively reasonable manner in light of the orders he received from Stalder (assuming arguendo that the order was given) and that the order was not unconstitutional or "facially outrageous." *Accord Jacobs v. West Feliciana Sheriff's Dep't*, 228 F.3d 388, 398 (5th Cir. 2000); *N.N. v. Madison Metropolitan Sch. Dist.*, 670 F. Supp.2d 927 (W.D. Wis. 2009) ("[P]ublic officials have an obligation to follow the Constitution even in the midst of a contrary directive from a superior or in a policy."); *Rose v. Town of Concord*, 971 F. Supp. 47, 50 (D. Mass. 1997) ("It is presumptively reasonable for a police officer to follow the order of a superior officer so long as that order does not violate a clearly established constitutional or statutory right.") Based on these standards, the Court finds that Stalder's limited testimony, along with the discovery conducted so far, is necessary for the plaintiff to respond the qualified immunity defense. Accordingly,

**IT IS ORDERED** that Warden Cornell Hubert's **Motion for Protective Order (Rec. Doc. No. 82)** is **GRANTED in part** and the deposition of Angela Whitaker on the issue of qualified immunity is quashed without prejudice to any future notice in connection with the substantive issues of this case.

**IT IS FURTHER ORDERED** that Warden Hubert's **Motion for Protective Order (Rec. Doc. No. 82)** is **DENIED in part** with regard to the deposition of Richard Stalder, which shall proceed immediately and within sufficient time for plaintiff to respond to the pending Motion to Dismiss by the August 10, 2010, deadline imposed by the District Court. Stalder's deposition shall be limited to his involvement, including communications, in the evacuation transfer and delivery of inmates to Elayn Hunt Correctional Center from Jefferson Parish and Orleans Parish in August of 2005 after Hurricane Katrina.

**IT IS FURTHER ORDERED** that Ronnie L. Morgan Jr.'s request for costs and attorneys' fees is **DENIED**.

New Orleans, Louisiana, this \_\_\_2nd\_\_\_ day of \_\_\_August\_\_\_, 2010.

_____
**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**